Order Entered.

Patrick M. Flatley
United States Bankruptcy Judge
Dated: Friday, May 23, 2008 4:17:55 PM

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| IN RE: | ) |
| | ) |
| ROBERT TODD KLEEB, and | ) Case No. 07-1332 |
| LINDA J. KLEEB | ) |
| | ) |
| Debtors. | ) Chapter 13 |

## MEMORANDUM OPINION

Robert and Linda Kleeb, d/b/a Kleeb's Music Center (the "Debtors"), propose to pay GMAC's secured automobile claim, in-full, at its 0% contract rate of interest. The Debtors also seek to modify the terms of the contract to extend the repayment period over the 60 month life of their proposed Chapter 13 plan, which would extend the loan term by about 3 years and 10 months.[1] Because the Debtors are modifying the terms of GMAC's loan, it asserts that it is entitled to interest. The court agrees.

Section 1322(b)(2) of the Bankruptcy Code authorizes a debtor to "modify the rights of holders of secured claims." 11 U.S.C. § 1322(b)(2). One common secured debt modification occurs when a debtor extends the maturity date of a note – that contractually occurs during the life of the Chapter 13 plan – to the end of the plan. *E.g.*, *Till v. SCS Credit Corp.*, 541 U.S. 465, 475 (2004) ("[A]uthority to modify the number, timing, or amount of the installment payments from those set forth in the debtor's original contract is perfectly clear."); *Joyner Auto World v. George (In re*

---

[1] The Debtors filed their Chapter 13 bankruptcy petition on October 11, 2007. At the time of filing, the Debtors were current on their obligation to GMAC, and the unpaid principal balance of the loan, secured by a 2003 GMC commercial delivery truck, was $10,261. Under the Debtors' proposed plan, they will pay GMAC about $171 a month over the next 60 months – until November 11, 2012. The last payment on the parties' pre-petition contract ($684) is due on January 26, 2009.

1

*George)*, 315 B.R. 624, 629 (Bankr. S.D. Ga. 2004) ("In the context of a Chapter 13 case, it is common for the terms of a contract to be modified by decreasing the payment [and] extending the term of the contract.").

When modifying the rights of secured creditors in a Chapter 13 plan, 11 U.S.C. § 1325(a)(5)(B)(ii) requires that the debtor pay the secured creditor "value, as of the effective date of the plan," that "is not less than the allowed amount of such claim." This is commonly referred to a "cram down" in bankruptcy parlance because a debtor's right to pay the allowed amount of a claim over the life of the Chapter 13 plan "may be enforced over the claim holder's objection." *Till*, 541 U.S. at 468. Due to the time value of money alone, secured claims must be paid over the life of the plan with interest. *E.g.*, *Assocs. Commer. Corp. v. Rash*, 520 U.S. 953, 966 (1997) ("Present value includes both the underlying value and the time-value of that interest.").

Of course, as the Supreme Court instructed in *Till*, 541 U.S. at 476, the court's task in choosing an interest rate encompasses more than just the time value of money. Other considerations include the fact that: the creditor cannot use the money right away, inflation may cause the value of the dollar to decline, and the creditor bears the risk of non-payment or loss. *Id.*

In choosing an appropriate rate of interest, the Court in *Till*, 541 U.S. at 477, specifically rejected the use of the parties' contractual interest rate. In the Court's view, application of the contract rate of interest produces "absurd results." *Id.* at 478. For example, "'inefficient, poorly managed lenders' with lower profit margins [may] obtain higher cram down rates than 'well managed, better capitalized lenders.'" *Id.* (citation omitted). Likewise, because the contract rate approach "relies heavily on a creditor's prior dealings with the debtor, similarly situated creditors may end up with vastly different interest rates." *Id.* Also, at the time a prime loan is issued, a debtor's financial circumstances are likely to have been significantly better: the financial "change in circumstances (job loss, for example) that rendered the debtor insolvent" generally has not yet occurred. *Id.* at 484. Similarly, national economic conditions may have either improved or declined since the issuance of the loan. *Id.*

Instead of the contract rate of interest, the *Till* Court believed that a "formula approach" that set the § 1325(b)(5)(B)(ii) interest rate 1-3 percentage points above the national prime rate was more

2

appropriate.[2]  As stated by the Court:

> Taking its cue from ordinary lending practices, the approach begins by looking to the national prime rate, reported daily in the press, which reflects the financial market's estimate of the amount a commercial bank should charge a creditworthy commercial borrower to compensate for the opportunity costs of the loan, the risk of inflation, and the relatively slight risk of default. Because bankrupt debtors typically pose a greater risk of nonpayment than solvent commercial borrowers, the approach then requires a bankruptcy court to adjust the prime rate accordingly. The appropriate size of that risk adjustment depends, of course, on such factors as the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan.

*Till*, 541 U.S. at 478-79.

In this case, the Debtors are attempting to modify the repayment terms of GMAC's loan by extending the loan's maturity date nearly four years.  At the same time, the Debtors argue that GMAC should be paid the contract rate, apparently under the assumption that GMAC's loan will be paid in full, and the loan modification does not seriously affect GMAC's rights under the contract. Paying more than 0% – more than the contract rate – the Debtors argue, results in a windfall to GMAC.  Moreover, the Debtors contend, *Till* only concerned the cram down of the creditor's secured claim from the amount owed ($4,894), to the value of the vehicle ($4,000), with the debtor treating $894 of the creditor's claim as unsecured and paying $4,000 over the life of the plan with interest.  541 U.S. at 470.  Thus, Till concerned the "strip down" of a secured claim to the value of the collateral, which is a different type of cram down than that proposed by the Debtors, who only seek to extend the loan's maturity date.

While the facts in *Till* involved a different type of cram down, the *Till* formula rate of interest is widely understood to apply to cram down proposals that extend the repayment length of a secured loan.  *E.g.*, *In re Davis*, No. 07-50761, 2007 Bankr. LEXIS 3175 at *9 (Bankr. M.D. Ga. Sept. 12, 2007) (applying *Till* to an extension of a loan's repayment term); *In re Grunau*, 355 B.R. 334, 336 (Bankr. M.D. Fla. 2006) (same); *In re Pryor*, 341 B.R. 648, 651 (Bankr. C.D. Ill. 2006) (same). Often, this does result in paying a secured creditor an interest rate higher than that required under the parties' contract. *E.g.*, *Davis*, 2007 Bankr. LEXIS 3175 at *10 (debtor must pay formula rate,

---

[2]  The prime rate periodically changes.  Effective April 30, 2008, the prime rate is 5.0%

3

not contract rate of 4.9%, when the debtor is only modifying the loan to extend the maturity date); *In re Grunau*, 355 B.R. at 336-37 ("[T]he Plan modifies the payment stream by extending the repayment term to the duration of the Plan. It is clear, therefore, that the present value requirement of Section 1325 applies to the Plan. Consequently, the interest rate in the original contract [0%] is irrelevant and the plan must provide for payment of interest in accordance with *Till*."); *In re Brill*, 350 B.R. 853, 856 (Bankr. E.D. Wis. 2006) (holding that the debtor must pay the *Till* rate; contract rate of 0% was determined by market factors that no longer apply).

Like the above courts, this court sees no reason to limit the application of *Till* only to those cases where the debtor is proposing a strip down of the secured claim to the value of the collateral. The formula rate of interest chosen in *Till* will also apply when a debtor modifies the loan repayment term to make lower monthly installments over a longer period of time. Indeed, the calculation of "value, as of the effective date of the plan" in § 1325(a)(5)(B)(ii) is a wholly independent calculation from the parties' contractual rate of interest.[3]

Therefore, the court will sustain GMAC's objection to confirmation of the Debtors' proposed Chapter 13 plan and give the Debtors 30 days to file an amended Chapter 13 plan that provides for interest at the *Till* rate on GMAC's claim secured by the 2003 GMC commercial delivery truck.

A separate order will be entered pursuant to Fed. R. Bankr. P. 9021.

---

[3] The Debtor also argues that the contract rate of interest applies to GMAC's loan on the grounds that it is an oversecured creditor under 11 U.S.C. § 506(b). That section, however, does not apply post-confirmation. *E.g.*, *Rake v. Wade*, 508 U.S. 464, 471 (1993) ("Section 506(b) 'directs that postpetition interest be paid on all oversecured claims,' and, as the parties acknowledge, such interest accrues as part of the allowed claim from the petition date until the confirmation or effective date of the plan.").

4